PAS

FILED ___ ENTERED
LOGGED ___ RECEIVED

IN THE UNITED STATES DISTRICT COURT FOR THE

MAY 3 0 2017

DISTRICT OF MARYLAND

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) | (Under Seal) |
| ) | |
| 2002 A Windsor Place, Baltimore, Maryland, ) | Case No. 17 - 1 3 9 1 - ADC |
| 21207, a multi-level residence with gray ) | |
| siding and "2002 A" affixed horizontally on ) | |
| the door ) | |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Donald August Mockenhaupt, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence located at 2002 A Windsor Place, Baltimore, Maryland, 21207 (hereinafter "SUBJECT PREMISES"). Based on the facts set forth herein, I submit there is probable cause to believe that KAMURI VALONTE LEAK (a/k/a "KIZZLE") is engaging in a conspiracy to distribute heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and that the SUBJECT PREMISES, further described in Attachment A, contains evidence, fruits, and instrumentalities of LEAK's offense, further described in Attachment B.

2. I am a duly appointed Special Agent of the Federal Bureau of Investigation (FBI) and have been employed as such since February 2002. I am currently assigned to a squad that investigates violent gangs and criminal enterprises out of the Washington (D.C.) Field Office, Northern Virginia Resident Agency, and I have been assigned to this squad since August 2004.

3. As an FBI Special Agent, I have received extensive training in the enforcement of the criminal laws of the United States, as well as extensive training in criminal investigations. I have also participated in numerous investigations involving unlawful narcotics distribution. In these investigations, I have been involved in the application for and execution of many arrest and search warrants for narcotics related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers of controlled dangerous substances.

4. Based on my training and experience, I know that:

a. Drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances.

b. Drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date, and/or times when controlled substances were purchased, possessed, transferred, distributed, sold, or concealed. Drug traffickers also maintain a their residences documents that demonstrate the obtaining, secreting, transfer, and/or

concealment of assets and obtaining, secreting, transfer, concealment and/or expenditure(s) of money.

      c.      Drug traffickers often communicate with their associates before, during, or after drug transactions by using cellular telephones. Drug traffickers communicate with their associates through verbal conversation, third party communication applications, or through the use of text messages. The recovery of text messages sent or received from a drug trafficker's cellular telephone can lead to identifying co-conspirators.

      d.      Drug traffickers routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other proceeds of illegal controlled substance transactions in their residences and/or stash houses. These individuals maintain this dirty money in their residences and/or stash houses, rather than depositing that money into a bank or other financial institution, in an attempt to avoid detection by law enforcement or by institutions that report suspicious financial activity to law enforcement.

      e.      Drug traffickers commonly maintain addresses and telephone number books or other documents, which reflect names, addresses and/or telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes, in electronic equipment, including but not limited to, computers, cellular telephones, and other electronic software and mediums.

      f.      Drug traffickers often store firearms near their illegal narcotics to protect the enterprise from other traffickers and law enforcement. Drug traffickers keep firearms, ammunition, and their accessories secreted within their residences and/or stash houses for extended periods of time.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. The facts and information contained in this affidavit are based upon my personal knowledge of this investigation and observations of other law enforcement officers involved in this investigation. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

## PROBABLE CAUSE

7. The FBI and the Arlington County Police Department (ACPD) are investigating a heroin conspiracy operating in the Eastern District of Virginia and elsewhere.

8. On or about December 16, 2016, the ACPD arrested a member of the conspiracy (hereinafter, "Cooperating Defendant 1" or "CD-1") for various offenses related to the distribution of heroin. For purposes of this affidavit, CD-1 will be referred to using masculine pronouns, regardless of whether CD-1 is male or female.

9. CD-1 is a heroin user who is currently seeking medical treatment for his heroin abuse. CD-1 has multiple arrests and convictions for various offenses, including unlawful possession of a firearm by a felon, burglary, grand larceny, credit card larceny, driving under the influence (DUI), and making false statements to a peace officer. CD-1 has pending charges at the state level for distribution of heroin and hit-and-run (vehicle damage). After consulting with counsel, CD-1 has signed a plea agreement with the U.S. Attorney's Office for the Eastern District of Virginia, acknowledging that he is guilty of distributing 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. CD-1 is cooperating with law enforcement in the

4

hope of receiving a possible sentence reduction. During the course of this investigation, CD-1 has made statements against his penal interests. Moreover, much of the information provided by CD-1 has been corroborated by controlled buys, physical surveillance, data downloaded from seized telephones, and call detail records. For these reasons, I consider CD-1 to be reliable.

10. When CD-1 was arrested on or about December 16, 2016, the ACPD found suspected heroin on CD-1's person and inside his vehicle. In addition, following CD-1's arrest, the ACPD obtained a search warrant for CD-1's residence. When they searched CD-1 residence, the ACPD found an additional quantity of suspected heroin. The suspected heroin was sent to the Commonwealth of Virginia Department of Forensic Science for analysis. The laboratory has finished analyzing the substances found on the defendant's person and inside his vehicle. Many of the substances tested positive for the presence of heroin or fentanyl. Investigators are still waiting for the results of the laboratory testing on the substances found inside the defendant's residence.

11. On or about February 10, 2017, investigators interviewed CD-1. During the interview, CD-1 told investigators that he obtained heroin from a supplier in Baltimore, who he referred to as "KIZZLE." CD-1 told investigators that he started purchasing heroin from KIZZLE around 2015. CD-1 estimated that he purchased heroin from KIZZLE on approximately 40 or 50 occasions. CD-1 typically purchased 10 grams of heroin. If the quality was good, he would return the following day and purchase approximately 50 grams. The largest amount of heroin that CD-1 purchased from KIZZLE was approximately 100 grams. After obtaining heroin from KIZZLE, CD-1 told investigators that he would cut the heroin with a

substance that he purchased from CVS pharmacy, and then he would redistribute the heroin to his customers in the Eastern District of Virginia.

12. On or about February 22, 2017, CD-1, acting under the direction and control of law enforcement, purchased approximately 10 grams of a heroin from KIZZLE, in exchange for $1,000 in official government funds. The transaction took place in Pikesville, Maryland. Following the transaction, the heroin was sent to the DEA Mid-Atlantic Laboratory. The substance weighed approximately 10.01 grams and tested positive for the presence of heroin. The substance also tested positive for the presence of Fentanyl.

13. Investigators conducted physical surveillance during the controlled purchase on or about February 22, 2017. As KIZZLE was leaving the meet location, investigators observed KIZZLE enter a silver Infiniti G37x sedan, with Maryland license plate number 4CS3905. A query of Maryland Motor Vehicles Administration (MVA) records indicated that the vehicle is registered to KAMURI VALONTE LEAK at an address in Baltimore, Maryland. In addition, following the controlled purchase, investigators compared surveillance video and photographs of KIZZLE taken during the controlled purchase to photographs of LEAK that investigators obtained from MVA records, Facebook, and law enforcement databases. The photographs of KIZZLE matched the photographs of LEAK.

14. CD-1 does not know KIZZLE's real name. During an interview in December 2016, CD-1 identified a photograph of a different individual as his Baltimore supplier. Following the controlled buy on or about February 22, 2017, CD-1 told investigators that the person who supplied him with the heroin during the controlled buy was his Baltimore supplier, who he had referred to as KIZZLE during his prior interview.

15. On or about March 7, 2017, CD-1, acting under the direction and control of law enforcement, conducted a controlled buy of approximately 25 grams of heroin from LEAK, in exchange for $2,740 in official government funds. The transaction took place in the parking lot of a hotel in Baltimore, Maryland. Following the transaction, the substance purchased by CD-1 was sent to the DEA Mid-Atlantic Laboratory. The substance weighed approximately 24.58 grams and tested positive for the presence of heroin.

16. Investigators conducted physical surveillance during the controlled buy on or about March 7, 2017. Investigators observed KIZZLE arrive and depart from the controlled buy driving the same car that he was driving during the first controlled buy on or about February 22, 2017. In addition, during the controlled buy on or about March 7, 2017, investigators set up surveillance outside of the registered address for LEAK's vehicle. Investigators did not observe LEAK leaving or returning to that residence before or after the controlled buy.

17. Following the second controlled buy, on or about March 16, 2017, the Honorable Theresa Carroll Buchanan, United States Magistrate Judge for the Eastern District of Virginia, issued a search warrant and order authorizing the disclosure of location based services data for LEAK's cellular telephone. Pursuant to the warrant and order, Sprint Corporation ("Sprint") provided investigators with GPS location data for LEAK's cellular telephone for the time period from March 17, 2017 to April 15, 2017.

18. I reviewed the GPS data and observed that LEAK's cellular telephone was located in the vicinity of the SUBJECT PREMISES on a daily basis from March 17, 2017 to April 2, 2017. The average degree of error was 36 meters. I also observed that LEAK's cellular telephone was located in the vicinity of the SUBJECT PREMISES during the late night/early

morning hours, which indicated to me that LEAK slept at the SUBJECT PREMISES on a daily basis.

19. On or about March 22, 2017, I drove past the SUBJECT PREMISES and observed LEAK's vehicle parked directly in front of the SUBJECT PREMISES. The GPS data for the same time as the surveillance was consistent with LEAK's cellular telephone being located at the SUBJECT PREMISES.

20. On or about April 2, 2017, CD-1 tried to communicate with LEAK over the telephone but there was no response. On or about April 6, 2016, CD-1 called LEAK's cellular telephone and an unknown man answered the phone. The man told CD-1 that he was "Kam's uncle," and that "Kam" gave him the phone. The man told CD-1 that he would tell "Kam" that CD-1 called him. Later that same day, LEAK contacted CD-1 on a new telephone number.

21. I reviewed the GPS data for LEAK's old phone number for the period from April 2, 2017 to April 17, 2017. The data was consistent with the telephone being located at the SUBJECT PREMISES on a daily basis. Accordingly, I believe that LEAK's uncle lives with LEAK at the SUBJECT PREMISES, or that LEAK's uncle borrowed LEAK's cellular telephone for a short period of time.

22. On or about April 13, 2017, CD-1, acting under the direction and control of law enforcement, conducted a controlled purchase of approximately 20 grams of heroin from LEAK, in exchange for $2,200 in official government funds. The transaction took place in the parking lot of a restaurant in Catonsville, Maryland. In addition to providing CD-1 with heroin, LEAK provided CD-1 with a free sample of cocaine. The substances obtained by CD-1 during the

transaction were field tested, and the suspected heroin field tested positive for heroin, and the suspected cocaine field tested positive for cocaine.

23. Prior to the controlled buy on or about April 13, 2017, investigators set up surveillance outside the SUBJECT PREMISES. At approximately 1:38 p.m., investigators observed LEAK's vehicle parked on the street in front of the SUBJECT PREMISES. At approximately 2:08 p.m., investigators observed LEAK's vehicle depart from the area. At approximately 2:12 p.m., LEAK's vehicle arrived at the meet location, which was the parking lot of a restaurant. LEAK entered CD-1's vehicle and completed the heroin transaction. Following the transaction, LEAK and an unidentified passenger who arrived at the meet location in LEAK's vehicle entered the restaurant. At approximately 2:37 p.m., LEAK and his passenger departed the area in LEAK's vehicle. Investigators followed LEAK's vehicle from the restaurant but they lost visual contact. Shortly thereafter, at approximately 2:59 p.m., investigators observed LEAK's vehicle parked on the street in front of the SUBJECT PREMISES.

24. On or about May 2, 2017, I reviewed a traffic violation warning that was issued to LEAK by the Baltimore County Police Department on or about April 9, 2017. The address on the warning was 2002 Windsor Place, Baltimore, Maryland.

25. On or about May 4, 2017, I conducted physical surveillance outside of 2002 Windsor Place, Baltimore, Maryland. I observed Leak's vehicle parked in front of the SUBJECT PREMISES.

26. On or about May 5, 2017, I conducted physical surveillance outside of 2002 Windsor Place, Baltimore, Maryland. I observed LEAK park his vehicle directly in front of the SUBJECT PREMISES and enter the door labeled "2002 A."

27. I reviewed online property records for the State of Maryland. Based on the records, there is no indication that 2002 Windsor Place is a legally subdivided property. However, based on physical surveillance and photographs, it appears that the residence located at 2002 Windsor Place is subdivided into two residences. In particular, there are two walkways leading to two front doors. One front door is labeled, "2002 A." The other front door is labeled, "2002 B." Based on physical surveillance, I believe that LEAK resides at "2002 A."

## CONCLUSION

28. Based on the foregoing, I respectfully submit that there is probable cause to believe that KAMURI VALONTE LEAK (a/k/a "KIZZLE") is engaging in a conspiracy to distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 846, and that evidence, fruits, and instrumentalities of LEAK's offense will be found inside the SUBJECT PREMISES. Accordingly, I respectfully request that the Court issue a warrant to search the SUBJECT PREMISES, further described in Attachment A, and to seize the items described in Attachment B.

Donald August Mockenhaupt
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 11th day of May, 2017.

The Honorable A. David Copperthite
United States Magistrate Judge
District of Maryland

10

## ATTACHMENT A

*Property to be searched*

The premises to be searched is located at 2002 A Windsor Place, Baltimore, Maryland 21207, within the county of Baltimore. The property is a multi-level residence with gray siding. It has white window frames and a white door. The address, "2002 A," is affixed horizontally across the door. The residence is attached to what appears to be a second residence that has "2002 B," affixed horizontally across the door.



11

## ATTACHMENT B

*Property to be seized*

The items to be seized are evidence, fruits, and instrumentalities of any violations of Title 21, United States Code, Sections 841(a)(1) and/or 846, to include:

1. Illegal narcotics and drugs, including, but not limited to, heroin, a Schedule I controlled substance.

2. Paraphernalia for packaging, cutting, cooking, weighing, and distributing heroin, including but not limited to, scales, baggies, cutting agents, and currency counting machines.

3. Records, receipts, notes, and other papers relating to the transportation, purchasing, packaging, and distribution of controlled substances.

4. Records, invoices, receipts, statements, drafts, money orders, checks, and other items relating to real estate, banking, financial institutions, or wire transfers that demonstrate the obtaining, secreting, transfer, and/or concealment of assets and obtaining, secreting, transfer, concealment, and/or expenditure(s) of money.

5. Mobile telephones, Blackberry devices, other mobile electronic devices used to communicate with others and the contents of such devices, to include contact lists, call logs, text messages, digital images, and communications applications.

6. United States currency (or its equivalent) and financial instruments.

7. Photographs of co-conspirators, controlled substances, and/or weapons and ammunition.

8. Address and/or telephone books, papers, and their contents, reflecting names, addresses, telephone numbers, including computerized or electronic address and telephone records.

9. Documents or items indicating occupancy, residency, rental and/or ownership of the SUBJECT PREMISES, including utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys.

10. Any locked or closed containers including safes, and their contents, which could include any of the above listed evidence.

11. Weapons, firearms, and ammunition, as well as items pertaining to the possession of firearms, including gun cases, ammunition magazines, holsters, spare parts for firearms, and receipts for the purchase of all these items.